**John B. WALTON, Jr.,**
**Appellant/Cross–**
**Appellee,**

v.

**HOOVER, BAX & SLOVACEK, L.L.P.,**
**Appellee/Cross–Appellant.**

**No. 08–03–00366–CV.**

Court of Appeals of Texas,
El Paso.

Oct. 14, 2004.

John McGrath Phalen Jr., Daniel J. Sheehan & Associates, L.L.P., Dallas, for appellant/cross-appellee.

Steven L. Hughes, Mounce, Green, Myers, Safi & Galatzan, El Paso, for appellee/cross-appellant.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## OPINION

SUSAN LARSEN, Justice.

This case involves a dispute between discharged attorneys and their former client over a contingent fee contract. John B. Walton, Jr. hired Hoover, Bax & Slovacek, L.L.P. to represent him regarding certain legal claims.[1] Walton later fired HBS, hired new counsel, and settled his claims for $900,000. HBS sued Walton, claiming entitlement to a fee of over $1.7 million. HBS asserted that under the termination clause of its agreement with Walton, Walton owed HBS 28.66 percent of the value of his claims at the time of termination, regardless of the amount for which he eventually settled the claims.

Based on the jury's verdict, the trial court awarded HBS $900,000 in damages, $140,000 in attorneys' fees incurred in the preparation and trial of this case, and $8,000 and $10,000, respectively, in attorneys' fees for appeals to the appellate court and the supreme court. The court also ordered Walton to pay $247,224.45 in pre-judgment interest, based on a rate of 6 percent, and set post-judgment interest at the rate of 10 percent.

Walton appeals, raising six issues. In a cross-appeal, HBS argues that the trial court should have set both the pre- and post-judgment interest rates at 18 percent. We conclude that the fee charged by HBS is unconscionable as a matter of law. Therefore, we reverse and render a take-nothing judgment in favor of Walton.

---

1. At the time of trial, the law firm had changed its name to Hoover Slovacek, L.L.P. For the sake of brevity, we will refer to the firm simply as "HBS."

## Factual Summary

### Walton's Hiring of HBS

Walton owns a ranch in Kermit, Texas that has been in his family since 1910. He became concerned that the oil and gas companies that have leases on the ranch were damaging the land and underpaying royalties. Jince Hanson introduced him to Steven Parrott, an HBS attorney based in Houston. Parrott was an experienced oil-and-gas lawyer, but was not a trial lawyer. He had previously worked with Hanson.

Walton testified that he did not interview any other lawyers to pursue his claims, but Parrott testified that Walton told him that he did interview other lawyers. Parrott also testified that he initially offered to represent Walton on an hourly fee basis or alternatively on a hybrid hourly/contingent basis. Walton, however, preferred to pay a straight contingent fee. Parrott then asked for a 40 percent contingent fee. But when Walton explained that he had already agreed to give Hanson 10 percent of his recovery, Parrott agreed to accept 30 percent, since Hanson had introduced him to Walton.

In June 1995, Parrott and Walton signed an engagement letter, which provided that HBS would represent Walton on all his claims against the oil and gas companies and that Walton would compensate HBS as follows:

> (A) You assign and convey to the Firm the following present undivided interest in Your Claims, which interests are hereinafter referred to as "Contingent Fee":
>
> > 30%—if settlement or collection is made after the date hereof and through any first trial, but before the commencement of a second trial or subsequent trial or the filing of an appeal by any party to the lawsuit;

> > 33%—if settlement or collection is made after the commencement of a second trial or subsequent trial or the filing of an appeal by any party to the lawsuit;
> >
> > . . .
>
> (C) In the event any party against whom You have a Claim for surface damages, conducts . . . surface clean-up . . . or other similar operations . . . for which You are not compensated by the payment of cash money, You shall pay the Firm a sum of money equal to 10% of the estimated fair market value of the expense of such Clean–Up. . . .
>
> (D) You shall, contemporaneously with the execution hereof, pay the Firm a non-refundable retainer fee of $10,000.00 ("Retainer"). The Retainer shall be credited against the first sums of money recovered by You . . ., or, at Your election, may be applied by You to the first non-cash fee obligation You may have to the firm pursuant to subsection (C) above. . . .

Importantly, the engagement letter included the following termination clause:

> You may terminate the Firm's legal representation at any time upon written request to the Firm addressed to my attention. If permission for withdrawal from employment is required by the rules of a Court, the Firm shall withdraw upon permission of the Court. *Upon termination by You, You agree to immediately pay the Firm the then present value of the Contingent Fee described in subsections (A) and (C) above*, plus all Costs then owed to the Firm, plus subsequent legal fees at the rate of $200.00 per hour of billed time, and Costs, if any, necessarily incurred by the Firm to facilitate the transfer of representation to any subsequent law firm and/or for the Firm to withdraw from any litigation. Likewise, the Firm

may withdraw from legal representation of You at any time, and for any reason, by giving You thirty (30) days advance written notice. In such event You shall be obligated for Costs which the Firm has incurred on Your behalf; provided, however, the Firm shall be entitled to retain all legal fees and Costs previously paid by You to the Firm. (Emphasis added.)

Parrott testified that he and Walton "talked about" and "agreed on" the termination clause. But he also testified that he wrote the engagement letter and chose its words.

Walton testified that he thought he understood the engagement letter when he signed it. He had graduated from high school, but had no post-high-school education. He was collecting $30,000 to $50,000 per month from the Bass leases. In addition to owning the ranch, Walton also owned some broadcast stations. He had previously hired attorneys on a contingent-fee basis.

After the engagement letter was signed, Walton and Parrott decided that it would be advisable for Walton to have a local attorney. Parrott testified that he orally agreed to reduce HBS's contingent fee to 28.66 percent to facilitate the hiring of Kevin Jackson as local counsel.

### HBS's Representation of Walton

Walton had potential claims against several companies. Parrott settled Walton's claim against El Paso Natural Gas for approximately $35,000, and HBS received its 28.66 percent of this settlement. Parrott also settled a claim against Texaco, under which settlement Texaco paid $175,000 in cash and performed some remediation measures. Although HBS received its 28.66 percent of the $175,000, it waived its right to 10 percent of the estimated fair market value of the cost of the remediation measures. Before Walton fired HBS, Parrott filed suit against two other companies. Those cases settled after the termination of representation for a total of $200,000, and Walton paid HBS its contingent fee.

In addition to these cases, Walton also had claims against companies controlled by the Bass Family of Fort Worth. To stop the statute of limitations from running, Parrott filed suit against the Bass companies soon after the engagement letter was signed. Parrott also filed a request for production of documents. He and Walton decided that before doing a complete audit—which would be expensive—they would hire someone to do a "spot check" on the documents produced by Bass to determine whether Walton had viable claims for the underpayment of royalties. Parrott and Walton interviewed several accounting firms, and on Parrott's recommendation, Walton hired a C.P.A. named Edward Holseth to do the spot check. In addition to Holseth's efforts, Parrott and other HBS representatives went to Walton's ranch, and Parrott went to Fort Worth to review documents. Parrott testified that Walton authorized him to accept $8.5 million to release his claims against Bass and his royalty interests under the Bass leases. In January 1997, Parrott made an initial demand on Bass for $58.5 million. Bass's counsel asked Parrott how he came up with this amount, and Parrott did not give him an answer.

In February 1997, Bass made a written response to the $58.5 million demand. Bass offered to settle the case for $6 million, with the following conditions: (1) Walton would dismiss his suit and execute a general release of all his claims; (2) Walton would convey to Bass his royalty interests under the leases; (3) Walton would grant Bass easements covering all lands on which its facilities were located;

and (4) Walton would convey to Bass the surface estate of approximately eight sections of the ranch and Bass would grant Walton a surface lease to use these sections for ranching, subject to any use Bass wanted to make of them. The sections that Bass wanted to buy constituted several thousand acres of the ranch.

Parrott was pleasantly surprised that Bass had offered so much money. Walton, however, was upset that the offer would require him to sell part of the ranch. Parrott testified that he told Walton that he believed they could reach a mutually acceptable agreement with Bass through a series of surface-waiver agreements, surface-damage agreements, and rights-of-way. According to Parrott, these agreements would accomplish what Bass wanted to accomplish by buying the land.

Shortly after Bass made its initial settlement offer, Walton sent a letter to Parrott, stating that he was "very unhappy with the way this case has been handled." Walton further stated that he was unsure as to whether he wanted to sell his royalty interests and that he wanted to reach a settlement of his claims against Bass before deciding whether to sell the royalty interests. Walton authorized Parrott to accept $6 million to settle his claim for underpayment of royalties. He refused to give up "any surface or mineral interest" as part of a $6 million settlement. Walton also stated that he felt confident that Bass would reject this offer.

### Walton's Termination of HBS

In March 1997, Walton terminated HBS. Walton testified that he was unhappy with Parrott's representation because "[n]othing was being done" on the Bass claims. He also believed that Parrott should have consulted him before making the $58.5 million demand. He described that demand as "absurd." He believed that it caused him to lose credibility with Bass because a retired Bass employee told him that "[t]hey were falling in the hallway laughing about it." On the other hand, Parrott believed that "you can't ask for too much money because you don't know what Bass thinks this case is worth."

### Walton's Settlement with Bass

Walton retained another law firm to facilitate a settlement of his claims against Bass in a manner that would also resolve the dispute between Walton and HBS regarding HBS's fees. In July 1997, Bass informed this firm that it was not interested in mediating the case, "given the numerous allegations of Mr. Walton, the lack of any expert reports or other evidence supporting the claims, and the amount your client has demanded in settlement discussions."

In September 1997, HBS agreed to represent Walton at a settlement conference or mediation and Walton agreed to compensate HBS in accordance with subsections (A) and (C) of the engagement letter if the case settled as a result of the settlement conference or mediation. But no settlement was reached with Bass, and Bass refused to participate in mediation. Bass's counsel sent a letter to local counsel Jackson, explaining its refusal to participate in mediation. The letter states:

Given the very large gap that remained between the parties after our several settlement discussions, our clients reasonably believed that formal mediation would serve no purpose until the Plaintiff could supply legal theories, facts and calculations supporting the amounts of damages for his claims. We never received any such information. [We] have been forthcoming in summarizing our understanding of your client's claims, and the Defendants' opinion of the potential exposure. We never received

any similar explanation from the Plaintiff's side; rather, we only received demands for millions of dollars with no statement of plausible legal or factual bases to justify the demands. Under those circumstances, mediation was premature.

In October 1997, Alan Harris with Andrews & Kurth began representing Walton in his claims against Bass. Harris had been a trial lawyer for twenty years. He testified that Parrott had done little to develop Walton's claims. When Harris initially spoke with Bass's counsel, he was told that Bass was not interested in settling Walton's claims because there was no indication that any of the claims were meritorious. In January 1998, Harris offered to settle Walton's claims for $1 million. Bass rejected the offer.

In March 1998, Bass decided to buy production from a K & N facility near Walton's ranch and needed rights-of-way across the ranch to access its facility on the ranch. Harris viewed this as an opportunity to settle Walton's claims. He told Bass's counsel that he was unhappy that Bass had been ignoring Walton's claims and that Bass would have to "get serious" about the claims if it wanted to purchase the rights-of-way. In October 1998, Bass offered to settle the claims for $300,000. Harris eventually negotiated the settlement amount up to $900,000. Without the leverage they obtained as a result of the K & N transaction, he did not believe that he could have gotten that amount of money for Walton.

On November 16, 1998, Walton signed a settlement agreement, which provided that Bass would pay him $900,000 to settle his claims. On the same day, the parties entered into an agreement requiring Bass to pay Walton $250,000 in exchange for an option to acquire rights-of-way over the ranch and $224,000 to acquire initial rights-of-way. In exchange for $50,000, Walton also agreed to give his consent to the transfer of certain K & N assets and rights-of-way to Bass. Walton paid Andrews & Kurth $282,780.18 in attorneys' fees and costs.

### Value of the Claims at the Time of Termination and Determination of HBS's Fee

In a January 1998 letter to Walton, Parrott stated that HBS was not willing to wait to get paid until trial or settlement of Walton's claims. He also asserted that the case was worth at least $6 million at the time HBS was terminated because they had a live offer from Bass for that amount.

Parrott testified that HBS was seeking 28.66 percent of $6 million. This amounts to $1,719,600. Parrott contended that under the termination clause, the amount of Walton's eventual settlement was irrelevant in determining HBS's fees; all that mattered was the value of the claims at the time of termination. He testified, "We're entitled to be compensated on what *we believe to be the value of the case at the time of termination.* Just what our contract says." (Emphasis added.) At another point, he similarly testified, "Our fee was based on what *we believed to be the value of his claims. ...*" (Emphasis added.) Walton testified that he never agreed to pay HBS a percentage of what Parrott believed the case was worth.

Holseth was paid by HBS to testify at the trial. He testified that Bass "was cheating Mr. Walton in probably at least ten or twelve different ways...." One of those ways resulted in Walton's being shorted approximately $39,000 per month. Holseth thought Walton's damages were even more than that amount. Parrott testified that Holseth believed the underpayments totaled to at least $2 million to $4 million. But he admitted that Holseth

never came up with a firm number for the total amount that Bass was shorting Walton. Holseth testified that Parrott, Bass, and Walton did not provide him with all the documents he needed; consequently, he was unable to complete his work. Holseth indicated that he had frequent interaction with Parrott and that both of them worked diligently on the case. Both Parrott and Holseth testified that Holseth was planning to review more of the documents Bass had produced and do the complete audit when Walton fired HBS. Around the time that Walton fired HBS, Holseth quit working for Walton because Walton cursed at him, pressed him to quantify the claims, and complained about what Holseth was charging for his work.

Walton testified that although he paid Holseth between $35,000 and $40,000, neither Parrott nor Holseth ever told him what they thought his claims were worth. Holseth told him it would cost $80,000 to come up with a value.

Bass's counsel, Robert Grable, testified that Parrott's initial demand "was so big ... I quit listening basically." He stated that in March 1997, it would have surprised him if Bass would have been willing to pay even $500,000 simply to settle Walton's claims without acquiring any royalty or surface interests. Grable testified that Andrews & Kurth never amended the petition, never took a deposition, and never designated an expert. But he also testified that he believed the claims were more developed and posed more of a threat to Bass in November 1998 (when the settlement was reached) than they did in March 1997 (when Walton fired HBS). Grable believed that Bass would not have settled Walton's claims when it did and at the price it did if not for the K & N transaction. He stated, "In my opinion, but for the condition Mr. Walton imposed that he would not consent to the K & N transac-tion unless the lawsuit were settled, they would not have paid that much money at that time to settle the lawsuit."

Richard Bianchi, a former state district judge from Houston, testified as an expert witness for HBS. He had the responsibility of approving or disapproving attorneys' fees in hundreds of cases. He testified that the 28.66 percent contingent fee was reasonable and was in fact lower than normal. Regarding whether HBS was attempting to collect an unconscionable fee, he testified:

> It is what they agreed to in their own contract at the time of termination and if, as in this case, that amount that they agreed to turns out to be higher than what the case ultimately settled for, they're really apple and oranges. They agreed to an assessment at the time of termination and by contract, for better or for worse, that's what their deal is.

He also stated that "it would only be unconscionable to ignore the agreement of the parties."

Local counsel Kevin Jackson testified that the amount sought by HBS would be an unconscionable fee because it was more than Walton ultimately recovered. He did not even believe that HBS was entitled to 28.66 percent of the $900,000 that Walton received in settlement because Parrott did not do the job that a reasonably prudent attorney would have done. In Jackson's opinion, Walton had good cause to terminate HBS. He criticized Parrott for failing to develop the claims against Bass or prepare the case for trial and for making the $58.5 million demand. He believed that the demand destroyed their credibility with Bass because Parrott did not have any support for the amount he requested. According to Jackson, Walton's claims only had a nuisance value at the time Walton fired HBS.

Like Jackson, Harris testified that Walton had good cause to terminate HBS because of Parrott's unauthorized demand of settlement in the amount of $58.5 million. Based on his conversations with Bass's attorney, he believed that the $58.5 million demand damaged Walton's credibility.

## Procedural Background

In September 1998, HBS intervened in the suit between Walton and Bass to recover its attorneys' fees. The trial court dismissed the suit between Walton and Bass after they reached their settlement agreement and then severed HBS's claim. *See In re Hoover, Bax & Slovacek, L.L.P.,* 6 S.W.3d 646, 649 (Tex.App.-El Paso 1999, orig. proceeding). HBS sought a writ of mandamus from this Court, seeking to overturn the severance. *Id.* We denied the writ, *see id.* at 652, and the case between HBS and Walton proceeded to trial before a jury.

The jury found that Walton did not have good cause to terminate HBS. The charge required the jury to calculate HBS's damages by finding "[t]he then present value of [HBS's] contingent fee at the time Wal-ton terminated [HBS], on or about March 12, 1997, multiplied by .2866." [2] The jury found HBS's damages to be $900,000. [3] The jury also found that the fee charged by HBS was not unconscionable. Finally, the jury determined that HBS's reasonable and necessary attorneys' fees incurred in pursuing its claim against Walton were $140,000 for preparation and trial and $8,000 and $10,000, respectively, for appeals to the appellate court and the supreme court.

## Discussion

In his first issue on appeal, Walton argues that the fee charged by HBS is unconscionable as a matter of law. We agree.

As a general rule, courts have no authority over the fees clients pay their attorneys. *Thomas v. Anderson,* 861 S.W.2d 58, 62 (Tex.App.-El Paso 1993, no writ). The fee is a matter of contract between attorney and client. *Id.* But a court will not enforce an unconscionable fee arrangement. *Cf.* Restatement (Second) of Contracts § 208 (1981) (stating that a court may refuse to enforce an

---

**2.** This is a curious question. HBS has maintained that it is entitled to be paid pursuant to the termination clause, which states, "Upon termination by You, You agree to immediately pay the Firm the then present value of the Contingent Fee...." HBS has argued that the value of the contingent fee at the time of termination would be 28.66 percent of the value of the claim at the time of termination. Therefore, we assume that the parties intended for the jury to assess damages by determining the value of the claim at the time of termination and then multiplying that amount by .2866 to arrive at the value of the contingent fee. But by asking the jury to determine the "value of [HBS's] *contingent fee* ..., multiplied by .2866" (emphasis added), the question actually asked the jury to multiply the contingent fee itself by .2866. Because the contingent fee is the product of the value of the claim multiplied by .2866, the question effectively asked the jury to multiply by .2866

twice. Neither party, however, has complained about this question. And as discussed in footnote 3, *infra,* it does not appear that the jury did in fact multiply by .2866 twice.

**3.** This answer, too, is curious. If the contingent fee is 28.66 percent of the value of the claim at the time of termination, then the jury implicitly found the value of the claim to be $3,140,265.18 (3,140,265.18 × .2866 = 900,-000). Walton argues that the evidence is legally and factually insufficient to support this answer. Because we have concluded that HBS's fee is unconscionable as a matter of law, we need not reach these issues. However, we cannot help but notice that $900,000 is the exact amount for which Walton eventually settled the claim. Thus, one might speculate that rather than multiplying by .2866 twice, the jury failed to multiply by .2866 at all.

unconscionable clause of a contract). The Texas Disciplinary Rules of Professional Conduct prohibit a lawyer from entering into an arrangement for, charging, or collecting an unconscionable fee. Tex. Disciplinary R. Prof'l Conduct 1.04(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A (Vernon 1998) (Tex. State Bar R. art. X, § 9). "A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable." *Id.* Moreover, a lawyer must clearly and accurately explain how the fee is to be calculated. *Id.* cmt. 8; *see also Levine v. Bayne, Snell & Krause, Ltd.,* 40 S.W.3d 92, 95–96 (Tex.2001).

■ A client has the right to terminate representation at any time. Tex. Disciplinary R. Prof'l Conduct 1.15(a)(3) & cmt. 4; *see also* Charles W. Wolfram, Modern Legal Ethics § 9.5.2, at 545 (1986) ("It is now uniformly recognized that the client-lawyer contract is terminable at will by the client. For good reasons, poor reasons, or the worst of reasons, a client may fire the lawyer."). This right is based on the public policy of fostering confidence in the legal profession. Clients who have lost confidence in their attorneys should not be forced to continue the attorney/client relationship. *See Rosenberg v. Levin,* 409 So.2d 1016, 1021 (Fla.1982); Wolfram, *supra,* § 9.5.2, at 547; *see also Whiteside v. Griffis & Griffis, P.C.,* 902 S.W.2d 739, 746 (Tex.App.-Austin 1995, writ denied) (noting that public policy favors the right of clients to choose their lawyers); Tex. Disciplinary R. Prof'l Conduct 5.06 & cmt. 1 (limiting agreements that restrict the rights of lawyers to practice because such agreements also restrict the freedom of clients to choose their lawyers).

■ When a client terminates representation under a contingent-fee contract, the lawyer's compensation is determined by whether the client had good cause for the termination. If the client had good cause, the lawyer may recover in quantum meruit for services rendered up to the time of termination. *Augustson v. Linea Aerea Nacional–Chile S.A.,* 76 F.3d 658, 662 (5th Cir.1996) (applying Texas law); *Rocha v. Ahmad,* 676 S.W.2d 149, 156 (Tex.App.-San Antonio 1984, writ dism'd). But if the client terminated the representation without good cause, the lawyer is not limited to quantum meruit. The lawyer may also recover on the contingent-fee contract. *Mandell & Wright v. Thomas,* 441 S.W.2d 841, 847 (Tex.1969); *see also Augustson,* 76 F.3d at 662; *Law Offices of Windle Turley, P.C. v. French,* 140 S.W.3d 407, 413 (Tex.App.-Fort Worth 2004, no pet. h.). This means that if a client discharges a law firm without good cause, the firm may collect its entire contingency fee from the client's eventual recovery. *See Mandell & Wright,* 441 S.W.2d at 847.[4]

■ The parties may alter the above rules by providing in the fee agreement for the fee that will be paid upon discharge, as long as the fee is reasonable in light of the work performed. Laws. Man. on Prof. Conduct (ABA/BNA) 41:116 (Dec. 13, 1995). Because of the public policy favoring the right to choose counsel, however, a fee agreement may not provide for a fee

---

4. *Mandell & Wright* was decided in 1969. Today, the majority of jurisdictions do not follow the *Mandell & Wright* rule because it impinges on the clients' right to have the lawyer of their choice by forcing them to pay fees both to the discharged lawyer and a new lawyer. *See Augustson,* 76 F.3d at 662 n. 6; *see also* Restatement (Third) of The Law Governing Lawyers § 40 & cmt. b (2000). *But see French,* 140 S.W.3d at 413 (relying on *Mandell & Wright* to reject the argument that allowing a discharged firm to recover its contingent fee violates public policy by preventing the clients from discharging their attorneys at will).

upon discharge that penalizes the client for deciding to change counsel. *AFLAC, Inc. v. Williams*, 264 Ga. 351, 444 S.E.2d 314, 317 (1994); *Florida Bar v. Doe*, 550 So.2d 1111, 1113 (Fla.1989).

■ In addition to the right to change counsel, clients also have the right to decide whether to accept a settlement offer. Tex. Disciplinary R. Prof'l Conduct 1.02(a)(2). Consequently, a fee agreement may not contain a provision that infringes on this right. Laws. Man. on Prof. Conduct, *supra*, 41:118.

■ In this case, the termination clause required Walton "to immediately pay [HBS] the then present value of the Contingent Fee" if Walton terminated HBS's representation. Based on this clause, HBS demanded, or charged, a fee of $1,719,600—over $800,000 more than the amount Walton received pursuant to his settlement agreement with Bass. *See Comm'n for Lawyer Discipline v. Eisenman*, 981 S.W.2d 737, 741 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (defining "charge" in the context of Disciplinary Rule 1.04(a) as "to ask payment of"). Although the jury did not award HBS $1.7 million, it did award the firm $900,000— 100 percent of the settlement amount and approximately 63 percent of the total amount that Walton received from Bass.[5]

In evaluating HBS's fee, we begin with this most obvious point: HBS demanded more than the total amount that Walton received from Bass and was awarded 100 percent of the settlement amount. Walton argues that a 100 percent contingency fee is *per se* unconscionable. Relying on our opinion on its petition for writ of mandamus, HBS counters that its fee was not a contingency fee, but a "buy-out fee." We held in our earlier opinion that the termination clause "requires Walton to 'buy out' HBS's interest in the cause of action should Walton choose to terminate HBS's services." *In re Hoover, Bax & Slovacek*, 6 S.W.3d at 651.

Although the cost of the "buy-out" is calculated by determining the present value of the contingent fee, we agree with HBS that its fee was not a true contingent fee because it was not dependent upon the outcome of the case. *See* Tex. Disciplinary R. Prof'l Conduct 1.04(d); *Eisenman*, 981 S.W.2d at 741; *see also* Restatement (Third) of the Law Governing Lawyers § 35 cmt. a (2000); Wolfram, *supra*, § 9.4.1, at 526. But we do not agree with the implication that a 63 percent–100 percent "buy-out fee" is more justifiable than a 63 percent–100 percent contingent fee. Their dependent nature is what justifies large contingent fees; the potential to earn large fees compensates attorneys for the risk that they will receive nothing if a case

---

**5.** In addition to the $900,000, Walton received $524,000 from Bass pursuant to the K & N option and consent agreements. HBS asserts that this $524,000 should be included in the settlement amount because Walton testified that all the agreements were part of the same package. The K & N transaction arose after Walton discharged HBS. Walton's testimony indicates that he refused to grant Bass the necessary rights for it to complete the K & N transaction unless Bass would settle his claims. It is in that sense that the agreements were a package deal. Grable and Harris, the opposing lawyers who negotiated the "package," testified that the K & N transaction gave

Walton the leverage to get his claims settled. There is nothing in the record to suggest that the option and consent agreements were shams or that the rights conveyed by Walton in those agreements were worthless. Harris testified that the option agreement gave Bass valuable rights for which a landowner would normally be paid. Even Parrott admitted that Bass "probably would" have had to pay Walton for the rights regardless of the existence of Walton's claims against Bass. Nevertheless, we will assume *arguendo* that the $524,000 might be properly considered as part of Walton's settlement.

is lost. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). The fee provided for in the termination clause was divorced from this risk. Under its interpretation of the termination clause, HBS was entitled to a percentage of the value of the case, regardless of the amount that Walton received from a judgment or settlement. HBS actually received more upon termination than it would have if it had not been fired and had represented Walton in the eventual settlement. Thus, the justification for allowing a large percentage fee does not apply to the so-called "buy-out fee."

HBS also argues that under other types of fee arrangements, such as hourly charges and nonrefundable retainers, clients may end up paying more in attorneys' fees than they recover. Such fees, like all fees, are reviewable for their reasonableness and may be found unconscionable if they are excessive under the circumstances of a particular case. In any event, HBS's fee in this case is different from hourly and retainer fees in that it bears no relation to the consideration provided by HBS. Hourly fees are based on the value of the time the attorney spends on the client's case. Retainers are based on the income lost and the costs incurred by an attorney who agrees to be on call to handle the client's legal matters. *See* Restatement (Third) of the Law Governing Lawyers § 34 cmt. e (2000); Wolfram, *supra*, § 9.2.2, at 506. In appropriate cases, large hourly or retainer fees are permissible based on the amount of time the lawyer reasonably spent on the case or on the income lost and costs incurred by the lawyer. HBS's fee, however, was not based on any of these considerations.

In short, the fee charged in this case was not based on the value of the work performed, nor was it tied to Walton's actual recovery. Under these circumstances, allowing a discharged law firm to collect a fee equaling 63 percent–100 percent of its former client's recovery would violate public policy by penalizing the client for discharging the firm. *See Doe*, 550 So.2d at 1111–13 (disapproving of a termination clause that required the client to pay the greater of $350 per hour or 40 percent of the greatest gross amount offered in settlement because the effect of the clause was to penalize the client for exercising the right to fire the attorney). The termination clause is similar to an unenforceable liquidated damages provision. *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex.1991) (holding that a liquidated damages provision is an unenforceable penalty unless the actual damages are difficult to estimate and the liquidated damages are a reasonable forecast of just compensation); *see also* Restatement (Second) of Contracts § 208 cmt. e (1981) (stating that unreasonably large liquidated damages are not recoverable because they are unconscionable).

HBS's principal argument as to why it is entitled to a $900,000 fee is that the termination clause seems to allow this result. HBS's expert echoed this argument when he testified that the parties "agreed to an assessment at the time of termination and by contract, for better or for worse, that's what their deal is." To accept HBS's argument and its expert's testimony would eviscerate the rule prohibiting unconscionable fees. The rule presupposes that the parties may have "enter[ed] into an arrangement for" the fee. *See* Tex. Disciplinary R. Prof'l Conduct 1.04(a); *see also* Restatement (Third) of the Law Governing Lawyers § 34 cmt. a (2000) (stating that an unreasonable fee will not be enforced even if the parties agreed to it). As one judge has noted, "[W]hen construing contracts between lawyers and clients, it is not enough to simply

say that a contract is a contract. There are ethical considerations overlaying the contractual relationship." *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 868 (Tex.2000) (Gonzales, J., concurring and dissenting).

HBS's contractual argument is particularly misplaced in this case because the termination clause does not contain any explanation as to how the "present value of the Contingent Fee" was to be determined.[6] Assuming, as HBS has argued, that the clause should be interpreted to require Walton to pay 28.66 percent of the value of his claims at the time of termination, the engagement letter provides no method for valuing Walton's claims. For example, was the value to be determined by settlement offers? If so, how would the value be determined if there were no settlement offers at the time of termination? Would the value be based on Holseth's calculations? What if Holseth had not made any calculations at the time of termination?

 Parrott's testimony indicates that the present value of the contingent fee was whatever HBS said it was. He testified, "Our fee was based on what *we believed to be the value of his claims ...*" and that "[w]e're entitled to be compensated on what *we believe to be the value of the case at the time of termination.*" (Emphasis added.) Walton, however, did not understand that he had agreed to have the fee determined by what Parrott believed the claims were worth. An agreement that leaves the damages to be paid upon termination by one party wholly within the unfettered discretion of the other party is so one-sided as to be substantively unconscionable. *See In re Palm Harbor Homes,* 129 S.W.3d 636, 645 (Tex.App.-Houston [1st Dist.] 2003, orig. proceeding) (mand.filed) (recognizing that substantive unconscionability focuses on the one-sidedness of the transaction).

Moreover, Parrott's opinion that the claims were worth at least $6 million was based in part on Bass's $6 million settlement offer. Requiring Walton to pay a fee derived from this amount would effectively penalize him for refusing the settlement offer. *See* Laws. Man. on Prof. Conduct, *supra,* 41:118 (fee agreement may not require the client to pay a fee based on the larger of a proffered settlement amount or the amount recovered at trial).

We recognize that the question of unconscionability was submitted to the jury and the jury determined that HBS had not charged an unconscionable fee. But under the unusual and undisputed facts of this case, we agree with Walton that for reasons of public policy the fee charged by HBS was unconscionable as a matter of law.

This opinion should not be read to infringe upon the rights of discharged attorneys to be compensated for their work or upon the freedom of attorneys and clients to agree upon a reasonable compensation for a discharged attorney. We simply hold that when a fee: (1) is paid to a law firm that was discharged over a year and a half before settlement of the case; (2) equals 63 percent–100 percent of the former client's recovery; (3) is not tied to the work performed or the risk incurred by the firm; (4) arises from an agreement

---

**6.** The use of the term "present value" would seem to suggest that Walton was obligated to pay HBS a sum of money that, with interest, would equal what HBS would have eventually received upon settlement or collection of judgment. *See* Black's Law Dictionary 1203 (7th ed.1999) (defining "present value"); Webster's Ninth New Collegiate Dictionary 931 (1986) (same). But the termination clause does not reference a discount rate or an applicable time period and neither party has interpreted the clause this way.

that does not clearly and accurately explain how the fee is to be calculated; (5) allows the discharged attorneys unfettered discretion in determining the value of their fee; and (6) is derived in part from a settlement offer rejected by the client, the fee operates as a penalty for termination and refusal of settlement. As such, it is unconscionable as a matter of law and public policy.

HBS asserts that Walton ratified the engagement letter by accepting the benefits of HBS's representation on his non-Bass claims and by paying HBS's fees from the settlements he received on those claims. HBS did not assert ratification in the trial court, and the issue cannot be raised for the first time on appeal. *See Zuniga v. Allstate Ins. Co.,* 693 S.W.2d 735, 739 (Tex.App.-San Antonio 1985, no writ). Furthermore, a contractual provision that violates public policy cannot be ratified. *See Mercury Life & Health Co. v. Hughes,* 271 S.W.2d 842, 846 (Tex.Civ. App.-San Antonio 1954, writ ref'd); *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.,* 779 S.W.2d 474, 478 (Tex. App.-El Paso 1989, writ denied); *Ussery v. Hollebeke,* 391 S.W.2d 497, 502 (Tex.Civ. App.-El Paso 1965, writ ref'd n.r.e.).

Having concluded that HBS may not recover the $900,000 fee under the termination clause, we must determine whether HBS is entitled to any recovery under an alternate theory. As explained above, a law firm discharged without good cause may recover on its fee agreement or in quantum meruit. Although HBS pleaded quantum meruit in the trial court, quantum meruit was not submitted to the jury as an alternate ground of recovery. Instead, the jury was instructed to answer questions regarding quantum meruit only if it found that Walton had good cause to fire HBS. HBS did not object to this part of the charge or request that the jury be required to answer the quantum meruit questions. Moreover, HBS did not present any evidence on the reasonable value of its services. And HBS has not prayed for a remand on its quantum meruit claim in the event that we reversed the trial court's judgment. Under these circumstances, we will not remand for a new trial on the quantum meruit claim. *See PIC Realty Corp. v. Southfield Farms, Inc.,* 832 S.W.2d 610, 616 (Tex.App.-Corpus Christi 1992, no writ); *cf.* Tex.R. Civ. P. 279; *Kittyhawk Landing Apartments III v. Anglin Constr.,* 737 S.W.2d 90, 93–94 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.).

### Conclusion

For the reasons stated herein, we sustain Walton's Issue 1.A and reverse the judgment of the trial court. Having found no basis for a remand, we render judgment that HBS take nothing from Walton. Given this disposition, we find it unnecessary to address Walton's remaining issues or the issue raised in HBS's cross-appeal.