IN THE SUPREME COURT OF TEXAS









IN THE SUPREME COURT OF TEXAS

 

════════════

No. 04-1004

════════════

 

Hoover Slovacek LLP, formerly 

Hoover, Bax & Slovacek, LLP,
Petitioner,

 

v.

 

John B. Walton, Jr.,
Respondent

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Eighth District of Texas

════════════════════════════════════════════════════

 

 

Argued December 1,
2005

 

 

Chief Justice Jefferson delivered the
opinion of the Court, in which Justice O’Neill,
Justice Wainwright, Justice Brister, Justice Green, and Justice Johnson joined.

 

Justice Hecht filed a dissenting
opinion, in which Justice Medina and
Justice Willett joined.

 

We
deny Walton’s motion for rehearing and grant Hoover Slovacek’s motion for
rehearing. We withdraw our opinion of June 30, 2006 and substitute the
following in its place.

In
this case, we must determine whether an attorney hired on a contingent-fee
basis may include in the fee agreement a provision stating that, in the event
the attorney is discharged before completing the representation, the client
must immediately pay a fee equal to the present value of the attorney’s
interest in the client’s claim. We conclude that this termination fee provision
is contrary to public policy and unenforceable. We affirm the court of appeals’
judgment in part, reverse in part, and remand to the court of appeals for
further proceedings.

I

Background

In
June 1995, John B. Walton, Jr. hired attorney Steve Parrott of Hoover Slovacek
LLP (Hoover) to recover unpaid royalties from several oil and gas companies
operating on his 32,500 acre ranch in Winkler County. The engagement letter
granted Hoover a 30% contingent fee for all claims on which collection was
achieved through one trial. Most significantly, the letter included the
following provision:

 

You may terminate
the Firm’s legal representation at any time . . . . Upon termination by You,
You agree to immediately pay the Firm the then present value of the Contingent
Fee described [herein], plus all Costs then owed to the Firm, plus subsequent
legal fees [incurred to transfer the representation to another firm and
withdraw from litigation].

 

Shortly
after signing the contract, Walton and Parrott agreed to hire Kevin Jackson as
local counsel and reduced Hoover’s contingent fee to 28.66%. Parrott negotiated
settlements exceeding $200,000 with Texaco and El Paso Natural Gas, and Walton
paid Hoover its contingent fee. Parrott then turned to Walton’s claims against
Bass Enterprises Production Company (Bass), and hired accountant Everett
Holseth to perform an audit and compile evidence establishing the claims’
value.[1] Meanwhile, Walton
authorized Parrott to settle his claims against Bass for $8.5 million.

In
January 1997, Parrott made an initial settlement demand of $58.5 million. Bass’s
attorney testified that Parrott was unable to support this number with any
legal theories, expert reports, or calculations, and that the demand was so “enormous”
he basically “quit listening.” The following month, however, Bass offered $6
million not only to settle Walton’s claims, but also to purchase the surface
estates of eight sections of the Winkler County ranch, acquire numerous
easements, and secure Walton’s royalty interests under the leases. Walton
refused to sell, but authorized Parrott to accept $6 million to settle only
Walton’s claims for unpaid royalties. Walton also wrote Parrott and expressed
discontent that Parrott did not consult him before making the $58.5 million
demand. According to Walton, Parrott responded by pressuring him to sell part
of the ranch and his royalties for $6 million. In March 1997, Walton discharged
Parrott, complaining that Parrott was doing little to prosecute his claims
against Bass and had damaged his credibility by making an unauthorized and “absurd”
$58.5 million demand.

Walton
then retained Andrews & Kurth LLP, which, in November 1998, settled Walton’s
claims against Bass for $900,000. By that time, Hoover had sent Walton a bill
for $1.7 million (28.66% of $6 million), contending that Bass’s $6 million
offer, and Walton’s subsequent authorization to settle for that amount,
established the present value of Walton’s claims at the time of discharge. Walton
paid Andrews & Kurth approximately $283,000 in hourly fees and costs, but
refused to pay Hoover.

When
 Hoover sought to intervene in the settlement proceedings between Walton and
Bass, the trial court severed Hoover’s claim, and the parties tried the case
before a jury. Richard Bianchi, a former state district judge in Harris County, testified as Hoover’s expert witness. Bianchi opined that a 28.66% contingent
fee was, “if anything, lower than normal, but certainly reasonable under these
circumstances,” and that “it would only be unconscionable to ignore the
agreement of the parties.” He also testified that charging more than Walton
ultimately recovered from Bass “doesn’t change the deal they made. That’s just
a bad business deal.” In contrast, Walton’s local counsel, Kevin Jackson,
testified that he had never heard of attorneys charging a percentage based on
the present value of a claim at the time of discharge rather than the client’s
actual recovery, and that the $1.7 million fee was unconscionable.

The
jury failed to find that Walton discharged Hoover for good cause or that Hoover’s fee was unconscionable. The trial court entered judgment on the verdict, which
awarded Hoover $900,000.[2] The court of appeals
reversed and rendered a take-nothing judgment for Walton, concluding that Hoover’s fee agreement was unconscionable as a matter of law. 149 S.W.3d 834, 847. We
granted Hoover’s petition for review. 49 Tex. Sup. Ct. J. 15 (Oct. 17, 2005). Because
our reasoning differs from the court of appeals’ in some respects, we affirm
its judgment in part, reverse in part, and remand this case to the court of
appeals.

II

Discussion

 

When
interpreting and enforcing attorney-client fee agreements, it is “not enough to
simply say that a contract is a contract. There are ethical considerations
overlaying the contractual relationship.” Lopez v. Muñoz, Hockema &
Reed, L.L.P., 22 S.W.3d 857, 868 (Tex. 2000) (Gonzales, J., concurring and
dissenting).

 

In Texas, we hold
attorneys to the highest standards of ethical conduct in their dealings with
their clients. The duty is highest when the attorney contracts with his or her
client or otherwise takes a position adverse to his or her client’s interests. As
Justice Cardozo observed, “[a fiduciary] is held to something stricter than the
morals of the marketplace. Not honesty alone, but the punctilio of an honor the
most sensitive, is then the standard of behavior.” Accordingly, a lawyer must
conduct his or her business with inveterate honesty and loyalty, always keeping
the client’s best interest in mind.

 

Id. at 866-67 (alteration in original) (citations omitted). The
attorney’s special responsibility to maintain the highest standards of conduct
and fair dealing establishes a professional benchmark that informs much of our
analysis in this case.

Although
contingent fee contracts are increasingly used by businesses and other
sophisticated parties, their primary purpose is to allow plaintiffs who cannot
afford an attorney to obtain legal services by compensating the attorney from
the proceeds of any recovery. Arthur Andersen & Co. v. Perry Equip.
Corp., 945 S.W.2d 812, 818 (Tex. 1997). The contingent fee offers “the
potential of a greater fee than might be earned under an hourly billing method”
in order to compensate the attorney for the risk that he or she will receive “no
fee whatsoever if the case is lost.” Id. In exchange, the client is
largely protected from incurring a net financial loss in connection with the
representation.[3] This risk-sharing feature
creates an incentive for lawyers to work diligently and obtain the best results
possible.[4] A closely related benefit
is the contingent fee’s tendency to reduce frivolous litigation by discouraging
attorneys from presenting claims that have negative value or otherwise lack
merit.[5]

In
 Texas, if an attorney hired on a contingent-fee basis is discharged without
cause before the representation is completed, the attorney may seek
compensation in quantum meruit or in a suit to enforce the contract by
collecting the fee from any damages the client subsequently recovers. Mandell
& Wright v. Thomas, 441 S.W.2d 841, 847 (Tex. 1969) (citing Myers v.
Crockett, 14 Tex. 257 (1855)). Both remedies are subject to the prohibition
against charging or collecting an unconscionable fee. Tex. Disciplinary R. Prof’l Conduct 1.04(a), reprinted in
Tex. Gov’t Code, tit. 2,
subtit. G app. A (Tex. State Bar R.
art. X, § 9).[6] Whether a particular fee
amount or contingency percentage charged by the attorney is unconscionable
under all relevant circumstances of the representation is an issue for the
factfinder.[7] See, e.g.,
Curtis v. Comm’n for Lawyer Discipline, 20 S.W.3d 227, 233 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (concluding that the evidence was sufficient to
support a finding that a contingent fee equaling 70-100% of the client’s
recovery was unconscionable). On the other hand, whether a contract, including
a fee agreement between attorney and client, is contrary to public policy and
unconscionable at the time it is formed is a question of law. See, e.g.,
Tex. Bus. & Com. Code § 2.302
(courts may refuse to enforce contracts determined to be unconscionable as a
matter of law); Ski River Dev., Inc. v. McCalla, 167 S.W.3d 121, 136
(Tex. App.—Waco 2005, pet. denied) (“The ultimate question of unconscionability
of a contract is one of law, to be decided by the court.”); Pony Express
Courier Corp. v. Morris, 921 S.W.2d 817, 821 (Tex. App.—San Antonio 1996,
no writ) (distinguishing procedural and substantive aspects of
unconscionability).

Hoover’s termination fee provision purported to contract around the Mandell
remedies in three ways. First, it made no distinction between discharges
occurring with or without cause. Second, it assessed the attorney’s fee as a
percentage of the present value of the client’s claim at the time of discharge,
discarding the quantum meruit and contingent fee measurements. Finally, it
required Walton to pay Hoover the percentage fee immediately at the time of
discharge.

In
allowing the discharged lawyer to collect the contingent fee from any damages
the client recovers, Mandell complies with the principle that a
contingent-fee lawyer “is entitled to receive the specified fee only when and
to the extent the client receives payment.” Restatement
(Third) of the Law Governing Lawyers § 35(2) (2000). Hoover’s
termination fee, however, sought immediate payment of the firm’s contingent
interest without regard for when and whether Walton eventually prevailed. Public
policy strongly favors a client’s freedom to employ a lawyer of his choosing
and, except in some instances where counsel is appointed, to discharge the
lawyer during the representation for any reason or no reason at all. See
Martin v. Camp, 114 N.E. 46, 48 (N.Y. 1916) (describing this policy as a “firmly
established rule which springs from the personal and confidential nature” of
the attorney-client relationship); see also Whiteside v. Griffis &
Griffis, P.C., 902 S.W.2d 739, 746 (Tex. App.—Austin 1995, writ denied)
(noting that the policy supporting a client’s freedom to select his attorney
precludes the application of commercial standards to agreements that restrict
the practice of law); Tex. Disciplinary
R. Prof’l Conduct 1.15 cmt. 4 (“A client has the power to discharge a
lawyer at any time, with or without cause . . . .”). Nonetheless, we recognize
the valid competing interests of an attorney who, like any other professional,
expects timely compensation for work performed and results obtained. Thus,
attorneys are entitled to protection from clients who would abuse the contingent
fee arrangement and avoid duties owed under contract. Striving to respect both
interests, Mandell provides remedies to the contingent-fee lawyer who is
fired without cause. Hoover’s termination fee provision, however, in requiring
immediate payment of the firm’s contingent interest, exceeded Mandell
and forced the client to liquidate 28.66% of his claim as a penalty for
discharging the lawyer. Because this feature imposes an undue burden on the
client’s ability to change counsel, Hoover’s termination fee provision violates
public policy and is unconscionable as a matter of law.

Notwithstanding
its immediate-payment requirement, several additional considerations lead us to
conclude that Hoover’s termination fee provision is unenforceable. In Levine
v. Bayne, Snell & Krause, Ltd., we refused to construe a contingent fee
contract as entitling the attorney to compensation exceeding the client’s
actual recovery. 40 S.W.3d 92, 95 (Tex. 2001). In that case, the clients
purchased a home containing foundation defects, and stopped making mortgage
payments when the defects were discovered. Id. at 93. They agreed to pay
their lawyer one-third of “any amount received by settlement or recovery.” Id. A jury awarded the clients $243,644 in damages, but offset the award against the
balance due on their mortgage, resulting in a net recovery of $81,793. Id. The lawyer sued to collect $155,866, a fee equaling one-third of the gross
recovery plus pre- and post-judgment interest and expenses. Id. In
refusing to interpret “any amount received” as permitting collection of a
contingent fee exceeding the client’s net recovery, we emphasized that the
lawyer is entitled to receive the contingent fee “‘only when and to the
extent the client receives payment.’” Id. at 94 (quoting Restatement (Third) of the Law Governing
Lawyers § 35). A reasonable client does not expect that a lawyer engaged
on a contingent-fee basis will charge a fee equaling or, as in this case,
exceeding 100% of the recovery.[8] In Levine, we
noted that “‘[l]awyers almost always possess the more sophisticated understanding
of fee arrangements. It is therefore appropriate to place the balance of the
burden of fair dealing and the allotment of risk in the hands of the lawyer in
regard to fee arrangements with clients.’” Id. at 95 (quoting In re
Myers, 663 N.E.2d 771, 774-75 (Ind. 1996)). We believe Hoover’s termination
fee provision is unreasonably susceptible to overreaching, exploiting the
attorney’s superior information, and damaging the trust that is vital to the
attorney-client relationship.

The
Disciplinary Rules provide that a contingent fee is permitted only where, quite
sensibly, the fee is “contingent on the outcome of the matter for which the
service is rendered.” Tex. Disciplinary
R. Prof’l Conduct 1.04(d). Hoover’s termination fee, if not impliedly
prohibited by Rule 1.04(d), is directly forbidden by Rule 1.08(h), which states
that “[a] lawyer shall not acquire a proprietary interest in the cause of
action or subject matter of litigation the lawyer is conducting for the client,
except that the lawyer may . . . contract in a civil case with a client for a
contingent fee that is permissible under Rule 1.04.” Id. 1.08(h)(2). Thus,
even if Hoover’s termination fee provision is viewed as transforming a
traditional contingent fee into a fixed fee, it nonetheless impermissibly
grants the lawyer a proprietary interest in the client’s claim by entitling him
to a percentage of the claim’s value without regard to the ultimate results
obtained.

Examining
the risk-sharing attributes of the parties’ contract reveals that Hoover’s termination fee provision weighs too heavily in favor of the attorney at the
client’s expense. Specifically, it shifted to Walton the risks that accompany
both hourly fee and contingent fee agreements while withholding their
corresponding benefits. In obligating Walton to pay a 28.66% contingent fee for
any recovery obtained by Parrott, the fee caused Walton to bear the risk that
Parrott would easily settle his claims without earning the fee. But Walton also
bore the risk inherent in an hourly fee agreement because, if he discharged Hoover, he was obligated to pay a 28.66% fee regardless of whether he eventually
prevailed. This “heads lawyer wins, tails client loses” provision altered Mandell
almost entirely to the client’s detriment. Indeed, the only scenario in which Hoover’s termination fee provision would benefit Walton is if he expected the value of his
claim to significantly increase after discharging Hoover. In that case, Walton
could limit Hoover’s fee to 28.66% of a relatively low value, and avoid paying
28.66% of a much larger recovery eventually obtained with new counsel. Thus, it
is conceivable that a client viewing the events in hindsight could find that
the arrangement worked out to his benefit. At the time of contracting, however,
the client has no reason to desire such a provision because the winning
scenario is not only unlikely, but also entirely arbitrary in relation to its
timing and occurrence. Moreover, to the extent the client believes the value of
his claim will increase as a result of employing new counsel, a rational client
would forego the representation altogether rather than agree to the provision. In
sum, the benefits of Hoover’s termination fee provision are enjoyed almost
exclusively by the attorney.

Hoover’s termination fee provision is also antagonistic to many policies supporting the
use of contingent fees in civil cases. Most troubling is its creation of an
incentive for the lawyer to be discharged soon after he or she can establish
the present value of the client’s claim with sufficient certainty. Whereas the
contingent fee encourages efficiency and diligent efforts to obtain the best
results possible, Hoover’s termination fee provision encourages the lawyer to
escape the contingency as soon as practicable, and take on other cases, thereby
avoiding the demands and consequences of trials and appeals. Moreover, the
provision encourages litigation of a subset of claims that would not be pursued
under traditional contingent fee agreements.

Finally,
 Hoover’s termination fee provision creates problems relating to valuation and
administration, but not in the manner articulated by the court of appeals. The
court of appeals viewed the parties’ contract as empowering Parrott alone to
determine the value of Walton’s claims at the time of discharge, concluding
that “[a]n agreement that leaves the damages to be paid upon termination by one
party wholly within the unfettered discretion of the other party is so
one-sided as to be substantively unconscionable.” 149 S.W.3d at 846 (citations
omitted). We disagree, because nothing in their fee agreement indicates that
Parrott retained such discretion. On the contrary, the contract is silent with
respect to valuation. Nevertheless, its silence in that respect exposes an
additional defect—the contract fails to explain how the present value of the
claims will be measured. It does not describe how the nature and severity of
the client’s injuries will be characterized, nor does it state whether any
other factors, such as venue, availability and quality of witnesses, the
defendant’s wealth and the strength of its counsel, and the reprehensibility of
the defendant’s conduct will apply to the calculation. Lawyers have a duty, at
the outset of the representation, to “inform a client of the basis or rate of
the fee” and “the contract’s implications for the client.” Levine, 40
S.W.3d at 96 (citing Restatement (Third)
of the Law Governing Lawyers §§ 38(1), 18). We have stated that “to
impose the obligation of clarifying attorney-client contracts upon the attorney
‘is entirely reasonable, both because of [the attorney’s] greater knowledge and
experience with respect to fee arrangements and because of the trust [the]
client has placed in [the attorney].’” Levine, 40 S.W.3d at 95 (quoting Cardenas
v. Ramsey County, 322 N.W.2d 191, 194 (Minn. 1982)) (alterations in
original). For these reasons, the “failure of the lawyer to give at the outset
a clear and accurate explanation of how a fee was to be calculated” weighs in
favor of a conclusion that the fee may be unconscionable. Tex. Disciplinary R. Prof’l Conduct 1.04
cmt. 8. And while experts can calculate the present value of a claim at the
time of discharge, this extra time, expense, and uncertainty can be avoided
under hourly billing and the traditional contingent fee, even in cases in which
a discharged attorney seeks compensation from a disgruntled client.

Our
conclusion that Hoover’s termination fee provision is unconscionable does not
render the parties’ entire fee agreement unenforceable. See Restatement (Second) of Contracts § 208
(1981) (“If a contract or term thereof is unconscionable at the time the
contract is made a court may refuse to enforce the contract, or may enforce the
remainder of the contract without the unconscionable term, or may so limit the
application of any unconscionable term as to avoid any unconscionable result.”);
Williams v. Williams, 569 S.W.2d 867, 871 (Tex. 1978) (explaining that
an illegal provision generally may be severed if it does not constitute the
essential purpose of the agreement); In re Kasschau, 11 S.W.3d 305, 313
(Tex. App.—Houston [14th Dist.] 1999, no pet.) (concluding that an
unenforceable provision may be severed if the parties would have entered into
the contract without it). Walton paid Hoover its contingent fee for settlements
that Parrott negotiated with Texaco and El Paso Natural Gas, and Walton does
not contend that this portion of the agreement is unconscionable. On the
contrary, in his brief to the court of appeals, Walton argued in the
alternative that Hoover was limited to recovering 28.66% of the $900,000
settlement reached in the Bass litigation and requested rendition of judgment
in that amount. Severing the termination fee provision, the remainder of the
fee agreement is enforceable. Thus, if Hoover were discharged without cause, it
would be entitled to either its contingent fee or compensation in quantum
meruit. Mandell, 441 S.W.2d at 847.

The
court of appeals rendered a take-nothing judgment against Hoover, holding the
entire fee agreement unenforceable and denying a recovery in quantum meruit
because Hoover failed to present evidence of the reasonable value of its
services. 149 S.W.3d at 847. We agree that Hoover no longer has a claim for
quantum meruit, but we disagree with the take-nothing judgment. In the trial
court, Hoover sought to enforce the contract’s termination fee provision. Our
holding, however, severs the termination fee provision, leaving a contingent
fee contract subject to Mandell. The jury (1) found that Walton did not
comply with the contract and (2) failed to find that Walton had good cause to
discharge Hoover. Under Mandell, therefore, Hoover was entitled to its
contingent fee: 28.66% of $900,000, or $257,940. In the trial court, and again
in his appellate brief, Walton argued that Hoover was entitled to only this
amount, and Hoover requested this relief in the alternative in its brief to
this Court.[9] 

In
the court of appeals, however, Walton challenged the factual and legal
sufficiency of the evidence supporting the jury’s finding on the good-cause
issue. Because the court of appeals reversed and rendered judgment, it did not
reach Walton’s sufficiency points. Accordingly, we remand the case to that
court for consideration of those issues. 

III

Conclusion

 

Hoover’s termination fee provision penalized Walton for changing counsel, granted Hoover an impermissible proprietary interest in Walton’s claims, shifted the risks of the
representation almost entirely to Walton’s detriment, and subverted several
policies underlying the use of contingent fees. We hold that this provision is unconscionable
as a matter of law, and therefore, unenforceable. We affirm that part of the
court of appeals’ judgment reversing the trial court’s judgment, but reverse
its take-nothing judgment, and remand this case to the court of appeals for
further proceedings. Tex. R. App. P.
60.2(a), (d).

 

 

____________________________________

Wallace B. Jefferson

Chief Justice

 

OPINION DELIVERED: November
3, 2006









[1] Holseth never completed the audit, but testified that
he estimated the value of Walton’s claims at $2 million to $4 million.





[2] The jury was instructed to multiply the present value
of Walton’s claims at the time Hoover was discharged by 28.66%. Thus, the jury
presumably valued the claims at $3.14 million ($900,000 / .2866 ‘ $3.14
million). The court of appeals speculated that, because $900,000 is the exact
amount for which Walton settled with Bass, perhaps the jury inadvertently
failed to multiply this value by 28.66%. 149 S.W.3d 834, 842 n.3. Walton
challenges the legal sufficiency of the evidence supporting the jury’s implicit
finding that his claims were worth $3.14 million, but because we conclude that Hoover’s termination fee provision is unenforceable, we do not reach this issue.





[3] Depending on the terms of the agreement, clients
sometimes pay court costs and other expenses of the litigation.





[4] See Lester Brickman, Contingent Fees
Without Contingencies: Hamlet Without the Prince of Denmark?, 37 UCLA L. Rev. 29, 43 (1989)
(arguing that contingent fees are appropriate only in cases where there is a
realistic risk of nonrecovery).





[5] See Ted Schneyer, Legal-Process Constraints
on the Regulation of Lawyers’ Contingent Fee Contracts, 47 DePaul L. Rev. 371, 389-90 (1998) (arguing
that institutional constraints have made regulation of contingent fees
excessive and ineffective).





[6] Although the Disciplinary Rules do not define
standards of civil liability for attorneys, they are persuasive authority
outside the context of disciplinary proceedings, and we have applied Rule 1.04
as a rule of decision in disputes concerning attorney’s fees. Tex. Disciplinary R. Prof’l Conduct preamble
& 15; see also Johnson v. Brewer & Pritchard,
P.C., 73 S.W.3d 193, 205 (Tex. 2002); Bocquet v. Herring, 972 S.W.2d
19, 21 (Tex. 1998); Arthur Andersen, 945 S.W.2d at 818.





[7] Under the Disciplinary Rules, a fee is unconscionable
if a competent lawyer could not form a reasonable belief that the fee is
reasonable. Tex. Disciplinary R. Prof’l
Conduct 1.04(a). The reasonableness of a fee is determined by
considering all relevant circumstances relating to the representation,
including:

(1) the time and labor required, the novelty and
difficulty of the questions involved, and the skill required to perform the
legal services properly;

(2) the likelihood . . . that the acceptance of the
particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for
similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by
the circumstances;

(6) the nature and length of the professional
relationship with the client;

(7) the experience, reputation, and ability of the
lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results
obtained or uncertainty of collection before the legal services have been
rendered.

Tex. Disciplinary R. Prof’l
Conduct 1.04(b), cited in Arthur
Andersen, 945 S.W.2d at 818. 





[8] Hourly fee agreements and cases in which the
prevailing party recovers attorney’s fees from an opposing party do not
implicate the concerns presented here. Thus, pursuant to statute or a contract
between the parties, it is not uncommon for courts to approve fee-shifting
awards that exceed the damages recovered by the client. See, e.g., Hruska
v. First State Bank of Deanville, 747 S.W.2d 783, 785 (Tex. 1988)
(upholding $12,570 fee where the client recovered $2,920); Sibley v. RMA
Partners, L.P., 138 S.W.3d 455, 458-59 (Tex. App.—Beaumont 2004, no pet.)
(upholding $82,748 fee where the client stood to recover approximately
$43,000).





[9] Because the trial court’s judgment awarded Hoover the
more favorable recovery under its termination fee provision, Hoover was not
required to raise the alternative theory as a cross point on appeal. Boyce
Iron Works, Inc. v. Sw. Bell Tel. Co., 747 S.W.2d 785, 787 (Tex. 1988). Hoover’s contention that it is entitled to enforce its contingent fee arises
from the court of appeals’ judgment. It may be raised in this Court without
having first filed a motion for rehearing in the court of appeals. Tex. R. App. P. 49.9; see also
Bunton v. Bentley, 153 S.W.3d 50, 53 (Tex. 2004).