United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 14, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-50609
_____

In The Matter Of:  FRANKLIN Y. WRIGHT, JR.,

Debtor

– – – – – – – – – – – – – – – – – –

ROBERT M. STONE,

Appellee,

versus

JOHNNY W. THOMAS,

Appellant.

_____


_____

No. 04-50365
_____

In The Matter Of:  FRANKLIN Y. WRIGHT, JR.,

Debtor

– – – – – – – – – – – – – – – – – –

ROBERT M. STONE,

Appellant-Cross-Appellee,

versus

JOHNNY W. THOMAS, Trustee, Successor
in Interest to Debtor,

Appellee-Cross-Appellant.

_____

Appeals from the United States District Court
for the Western District of Texas
USDC No. SA-00-CV-166

_____

Before REAVLEY, JONES and GARZA, Circuit Judges.

PER CURIAM:[*]

We reverse the judgment insofar as it awarded actual and punitive damages for tortious interference, and affirm the judgment insofar as it awarded actual and punitive damages for conversion.

A.      Tortious Interference Claim

The bankruptcy court toiled admirably to reach a fair result in this legally and factually difficult case, but we cannot agree that the trustee was entitled to recover for tortious interference with contract.  While we do not question that Stone had a financial incentive and motive to persuade the clients to terminate Wright, we agree with Stone that he was privileged under Texas law to interfere with the contractual relationship between the clients and Wright.  Wright was convicted of tax fraud in December of 1997.  Under

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

Texas law, federal tax evasion is considered moral turpitude per se and is grounds for disbarment. In re Humphreys, 880 S.W.2d 402, 408-09 (Tex. 1994). Wright was in fact suspended and later disbarred as a result of this conviction.

The record further establishes that Wright's competence as an attorney had become compromised for reasons other than the conviction itself. Wright had been sanctioned by an agreed judgment in state district court in 1995 for commingling his and his clients' funds. The trustee admitted in the pretrial order that "Wright had a long-standing practice of borrowing from client recoveries, giving clients personal promissory notes instead of their money. Many of these clients are now creditors in this bankruptcy." Wright confirmed this practice at trial, and admitted that one client had to threaten to file a grievance to get Wright to pay her back. Stone was aware that "Wright had been siphoning client funds out of the trust accounts." Bankruptcy counsel for the law firm that represented Wright in his criminal case stated in a pretrial hearing that "I think this Court is certainly aware . . . that there's probably a bunch of people out there who have client trust funds that probably ought to take priority over anybody in this case."

Wright's own adversary proceeding complaint and amended complaint confirm that during his tax "ordeal," he "had begun to drink heavily outside of the office and, outside of the office, had become dependent upon alcohol." Wright's counsel stated at a pretrial hearing on a discovery dispute that Wright had been treated for alcohol addiction

3

at three facilities.  Wright admitted at trial that he is an alcoholic.  The judge in his criminal case ordered him to go for treatment.

Under his arrangements with his clients and with Stone, Wright was supposed to cover litigation expenses for the cases and office overhead for himself and Stone.  The contingent fee agreements provided that Wright would cover litigation expenses and that the clients were not responsible for reimbursing Wright unless there was a recovery.  Wright also paid health care expenses for clients pursuant to letters of protection.  These obligations were undoubtedly the reason he was able to retain a contingent fee interest of 60 percent or more of the fees in shared cases, more than the traditional referral fee, when the cases were turned over to Stone for further prosecution.

Wright's complaints admit that prior to and during his criminal trial, "some expenses were not paid, clients had not received settlement proceeds, and medical costs had not been reimbursed."  Stone was aware that Wright had failed to pay expenses on some cases.  Wright admitted that obligations under letters of protection had not been paid.  In January 1998 he wrote a letter to Stone stating that he had put his house up for sale to cover outstanding letters of protection.

In addition, there was ample evidence that Wright's office was in disarray during and subsequent to his tax conviction.  Stone testified that during the criminal trial Wright's staff had become preoccupied with that trial, and that the day after the jury verdict Wright showed up at the office staggering and visibly intoxicated.  One of Wright's employees testified that on the day of the verdict the employees were "in shock"

4

and "[a] few of the girls completely lost control." When Stone visited Wright a few days later at Wright's lake house, Wright was again intoxicated and told Stone he was going in for treatment. Diana Garcia, another attorney who worked in Wright's office, went with Stone to the lake house, and described Wright as laughing, crying, and "extremely intoxicated." Garcia moved out of Wright's offices shortly after Stone moved out. She testified that money had stopped coming into the office because "Mr. Wright had been away from the office for long, long periods of time."

Wright had told Stone that the IRS might try to seize the office. Wright testified that the IRS had levied on his business account three times in earlier years. The bookkeeper told Stone in December 1997 that she would have to raid the trust account to meet expenses. After the conviction Wright put the office up for sale. Stone testified that the building had been "up for foreclosure" several times. Garcia testified that Wright had told her the building had been posted for foreclosure. After the conviction Stone confirmed that the mortgage was not being paid. Garcia stated that although Wright told her "they would never take the building away from him . . . there were people coming by, photographing the building, and looking at it, and I know that it had been posted for foreclosure."

When asked to describe the atmosphere in Wright's office in December of 1997, Garcia testified that "aside from the chaos, everybody was despairing as to what they were going to be doing; looking for jobs. They were extremely concerned about what

5

was going to happen with the office and Franklin." She testified that to her knowledge Wright stopped coming into the office after the conviction.

As to all the clients whose cases are relevant to this appeal, an attorney-client relationship existed between Stone and the client. The trustee does not argue otherwise in his appellate briefing, and instead points out that with respect to the Person, Rakowitz, and other cases, "Stone was attorney of record for purposes of client contact, court appearances, and settlement and fund distribution" and refers to "the unremarkable proposition that Stone had an attorney-client relationship with the Clients." We agree with the bankruptcy court that "Stone already had an attorney-client relationship with the clients in question, as a result of Wright's having 'sent the files upstairs' to Stone. Stone entered appearances in court for the clients, advised clients regarding settlement potential, and the like."

In these circumstances, we believe that the Texas courts would view the attorney-client relationship between Stone and the clients as paramount to any relationship between Wright and Stone, and that Stone was privileged as a matter of law to inform the clients of Wright's conviction and that he could no longer work or associate with Wright. Even if Stone's conduct extended to expressly recommending that the joint clients fire Wright, which Stone denies, we conclude that the privilege would extend to such recommendations. Stone's first duty was to his clients. He had a informal fee sharing relationship with Wright, but he had a higher, fiduciary duty to his clients. The attorney-client relationship is highly fiduciary in nature and requires the utmost good

6

faith. Judwin Properties, Inc. v. Griggs & Harrison, 911 S.W.2d 498, 506 (Tex. App.–Houston [1st Dist.] 1995, no writ). "As a fiduciary, an attorney is obligated to render a full and fair disclosure of facts material to the client's representation." Willis v. Maverick, 760 S.W.2d 642, 645 (Tex. 1988).

In tortious interference cases, Texas law recognizes a justification defense or privilege based on the exercise of the defendant's own legal rights or a good faith claim to a colorable legal right. Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 80 (Tex. 2000). The Texas courts have also described the defense as applicable where the defendant has a right in the subject matter equal or superior to that of the other party. Southwestern Bell Tel. Co. v. John Carlo Tex., Inc., 843 S.W.2d 470, 472 (Tex. 1992); Sakowitz, Inc. v. Steck, 669 S.W.2d 105, 107 (Tex. 1984). If the defendant has a legal right to interfere with a contract, then he "has conclusively established the justification defense, and the motivation behind assertion of that right is irrelevant." Tex. Beef Cattle Co. v. Green, 921 S.W.2d 203, 211 (Tex. 1996). "[I]n a tortious interference case, a defendant's motivation behind the assertion of a legal right is irrelevant since the right conclusively establishes the justification defense." Calvillo v. Gonzalez, 922 S.W.2d 928, 929 (Tex. 1996).

Texas courts have also held that a person who shares a confidential relationship with a party to a contract is privileged to induce the breach of such a contract. John Masek Corp. v. Davis, 848 S.W.2d 170, 175 (Tex. App.–Houston [1st Dist.] 1992, writ denied); Russell v. Edgewood Indep. Sch. Dist., 406 S.W.2d 249, 252 (Tex. App.–San

7

Antonio 1966, writ ref'd n.r.e.). As an attorney Stone was a party to a confidential relationship with all his clients, whether or not those clients had signed fee agreements with Wright.

Under these authorities, Stone had a legal right and a duty to inform the clients of Wright's conviction. He further had a legal right to represent the clients in their ongoing litigation without the participation of Wright if the clients, once informed of Wright's conviction, chose to terminate Wright. "A client has the right to terminate representation at any time." Walton v. Hoover, Bax & Slovacek, L.L.P., 149 S.W.3d 834, 843 (Tex. App.–El Paso 2004, pet. field). The clients and Stone had a right to end their dependence on Stone and disassociate themselves from a convicted felon whose financial, mental, and legal capacity to practice law and fulfill his contractual obligations was plainly in jeopardy. On these facts we hold that Stone's fiduciary attorney-client relationship with the clients imbued him with a justification defense to Wright's tortious interference claims. We believe that the Texas Supreme Court would not hesitate to recognize that Stone's actions were privileged in these circumstances.

The trustee argues that there was no reason for Stone to encourage the clients to fire Wright other than Stone's greed. First, we think Texas law, as set forth in Texas Beef Cattle and Calvillo, quoted above, recognizes the justification defense regardless of Stone's financial motive. Second, we disagree with the factual premise of this argument. The trustee's theory, as we understand it, is that Stone had full responsibility for the cases in issue and his only reason for persuading the clients to fire Wright was to deprive

8

Wright of his share of the contingent fee. The trustee points to the "sole responsibility" letters Stone had written Wright. However, prior to Wright's termination, he was the only attorney with a written contingent fee agreement with the clients, and under Texas law a contingent fee contract must be in writing. TEX. GOV'T CODE ANN. § 82.065(a) (Vernon 2005); TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(d), reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 2005). Wright was arguably entitled to replace Stone at any time with other counsel or to take the cases back and attempt to settle or otherwise resolve them on his own. In a January 23, 1998 letter, Wright in fact told Stone that the files Stone had worked on in the past were Wright's files and "always have been my files," and demanded that Stone "return all of my files that you were assisting me on . . . ." Wright continued to insist at trial that "[t]hey were always my files," and even disputed that the clients had terminated him when they wrote letters stating that they were doing just that. The bankruptcy court found that Stone was "absolutely dependent" on Wright for payment of Stone's attorney's fees. Stone testified that on cases where Wright associated him, Wright continued to attend hearings, mediations, or depositions when needed. Stone testified that settlement checks went into Wright's trust account until Stone opened his own trust account in late 1997, and that even after Stone opened his own trust account, Wright's bookkeeper would often disburse settlement proceeds.

No client in these circumstances could be pleased by the criminal conviction of his lawyer. The only client who testified at trial, Mrs. Rakowitz, stated that she was

9

horrified when she learned the news of the jury verdict, that immediately she and her husband "didn't want Mr. Wright to have anything to do with our case, " and that the decision to fire Wright "was ours totally." Person's sports agent and personal attorney, Herbert Rudoy, testified that after learning of the conviction, he told Person "that he must immediately dismiss Mr. Wright as his attorney." None of the joint clients chose to remain with Wright. Wright was also obliged to front expenses for the litigation and there was evidence, described above, that he had sometimes failed to do so.

In addition, in 1998 affidavits in the record Wright claims that he associated Stone in the Rakowitz case "to assist me as co-counsel" and that "[h]ad I not been terminated by Mr. and Mrs. Rakowitz . . . it was my intention to attend the scheduled mediation of their lawsuit . . . ." Wright also testified in a deposition that he intended to participate in the Rakowitz trial, and that, after he associated Stone, he had interviewed witnesses and "was involved in the decision making of the case." The Rakowitz case was one of the two most valuable cases in issue. As to the most valuable case, the Person case, Rudoy testified that he understood that Wright was going to remain involved throughout the case. Wright testified that Stone "just worked" the files that Wright sent to him, but that the files belonged to Wright. In another case "sent upstairs" to Stone, the Browning case, Wright informed the client in a letter that Stone would be assisting Wright, and that the client could contact either attorney. Wright similarly wrote to Person, informing him that Wright had asked Stone "to work with me on your back injury claim." Wright testified that, due to Stone's people skills, "I was constantly intervening with clients . . . and I

10

would always tell them . . . that if they needed any help from me, why, I would certainly help them."

Stone was privileged if not obligated to inform the clients that Wright had been convicted of a felony, that his license to practice was in jeopardy, and that absent a termination Wright could still attempt to control the litigation and the disbursement of any settlement funds. The added circumstances that Wright was not funding all the expenses of the lawsuits as he was obliged to do under the arrangements with Stone and the clients, that Wright was suffering from alcoholism and emotional strain, that he had been sanctioned in the past, that he had borrowed money belonging to his clients and not paid them back, that he was missing work, and that his offices were in disarray, were all the more reason that Stone was privileged to interfere with Wright's contractual relationship with the clients.[1] Accordingly, the tortious interference claim fails, and the trustee is not entitled to actual or punitive damages on this claim.

B.    Contract Claim

The trustee argues in the alternative that if we reverse the judgment on the tortious interference claim, he should be able to seek recovery under the fee sharing agreement between Stone and Wright. We agree with the bankruptcy court that the fee sharing agreement was unenforceable under Rule 1.04(f) of the Texas Disciplinary Rules of

---

[1] On a related issue, and lest there be any belief that the trustee has a claim against the clients for terminating Wright without good cause, we categorically reject the trustee's suggestion, in the pretrial order, that "there is a serious question of whether Wright's termination was for good cause vis a vis the clients."

11

Professional Conduct, for the reasons explained in detail in the court's findings of fact and conclusions of law. Specifically, we do not agree with Stone that the statement in Wright's written contingent fee agreements that he "is hereby authorized to associate such other Attorney or Attorneys in this cause as they may desire" satisfies Rule 1.04(f)(1)(iii). This subpart requires that "[a] division or agreement for division of a fee" must be made "by written agreement with the client, with a lawyer who assumes joint responsibility for the representation." This is in addition to the requirement of subpart (2) that "the client is advised of and does not object to the participation of all the lawyers involved." We read subpart (f)(1)(iii) to require that the fee sharing agreement between Stone and Wright must be in writing and signed by the client. The mere authorization to associate other counsel in the contingent fee agreement, without setting out the fee splitting arrangement between Stone and Wright, or even identifying Stone, does not satisfy this subpart.

C.      Conversion Claim

The judgment included a recovery under a conversion theory for fees in the Kwon case. A distinction between the conversion claim and the tortious interference claim is that the client did not terminate Wright as to those cases subject to the conversion claim. Stone argues that there were actually two Kwon cases and that Wright did not have a contingent fee agreement in the case that was the subject of the conversion claim. We have reviewed the record on this claim and cannot say that the bankruptcy court's findings of fact were clearly erroneous. Stone never produced a written contingency fee

12

contract between himself and Kwon. He knew that Texas law requires contingency fee contracts to be in writing.

As stated above, we also agree with the bankruptcy court that the fee sharing agreement was unenforceable under Rule 1.04(f), a position Stone argued repeatedly in the bankruptcy court. The trustee is therefore entitled to the entire contingent fee of $12,000 on this claim.

We further see no error in the award of $36,000 in punitive damages on this claim. The issue of punitive damages was thoroughly litigated in the bankruptcy and district courts. The evidence supports a finding that Stone simply took for himself the entire fee in the Kwon case knowing that the fee was subject to a contingent fee agreement with Wright that had not been terminated by the client. Stone's only argument regarding punitive damages in the pending appeal is that punitive damages cannot be recovered absent tort liability and an underlying award of actual damages. Having concluded that the actual damages for conversion should stand, the punitive damages on that claim should also stand.

D.      Other Issues

The trustee does not persuade us that the bankruptcy court abused its discretion in denying costs. The denial of costs is all the more appropriate given our decision to vastly reduce the judgment. We see no error in the accrual date selected for post-judgment interest.

13

We reject the "acceptance of benefits" theory urged by the trustee. Stone did not forfeit his right to appeal a multi-million dollar judgment by arguing that he should be allowed to keep the $73,497.90 fee in the Moreno case in light of the bankruptcy court's ruling that the fee splitting agreement was unenforceable. The bankruptcy court rejected damages in the Moreno case due to a failure of proof of such damages. Both sides have taken inconsistent positions regarding the enforceability of the fee sharing arrangement. Even in the pending appeal, the trustee argues in the same brief that (1) the trustee is entitled to the entire fee in the Rakowitz, Person, and other cases, a position that necessarily embraces the holding below that the fee sharing agreement is unenforceable, and (2) in the alternative, the trustee is entitled to a share of the fees per the fee sharing agreement if that agreement is enforceable.

As to prejudgment interest, we do not agree with the trustee that prejudgment interest is governed by state law and therefore mandatory. We agree with the district court's analysis of this question. The bankruptcy court did not abuse its discretion in denying prejudgment interest under federal law. We note that the award of punitive damages in an amount equal to three times the amount of actual damages on the conversion claim appears more than adequate to compensate the trustee for the loss of the time value of money on the conversion damages.

E.     Conclusion

14

The judgment is modified to strike the award of $2,990,900 in actual damages for tortious interference, and to strike the award of $164,000 in punitive damages for tortious interference. The judgment is otherwise affirmed.

AFFIRMED AS MODIFIED.